AMBRO, Circuit Judge,
Dissenting in Part.
I agree with my colleagues that appellants are not entitled to qualified immunity on Atkinson’s retaliation and excessive force claims, and that we lack jurisdiction to decide whether appellants in supervisory positions are entitled to qualified immunity on all claims because they lacked notice of the underlying events. I part on but one issue. The majority holds that prison officials are not entitled to qualified immunity after housing an inmate in a prison where he is exposed to second-hand smoke, causing discomfort somewhere between that of hay fever and the common cold. Further, the majority calls this conclusion “clearly established” federal law, meaning that a reasonable prison official should have known that we would decide the case this way, even though the circuit courts have reached numerous differing results on this issue and there is no controlling precedent. The majority misconstrues the Supreme Court’s Eighth Amendment jurisprudence, and, a fortiori, wrongly deems its outcome “clearly established” for purposes of qualified immunity. I respectfully dissent from the reasoning and holding on this issue.
The plaintiff in this case has alleged that his exposure to second-hand cigarette smoke was cruel and unusual punishment in violation of the Eighth Amendment. The Supreme Court has recognized that a prisoner may, in the right circumstance, bring such a claim in federal court. The Court also recognized, however, that prison officials are entitled to qualified immunity from suit unless their actions violated a clearly established constitutional right of the plaintiff. Because the record with respect to this issue does not support denying the defendants’ motion for qualified immunity, I would reverse the decision of the District Court on Atkinson’s Eighth Amendment claim.
Qualified Immunity
The majority states the correct test for qualified immunity from Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 *272 L.Ed.2d 272 (2001). We ask first whether the plaintiff alleges facts that state a constitutional violation. If the answer is yes, we ask whether the right claimed is clearly established, meaning that “it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Id. at 202, 121 S.Ct. 2151. Notwithstanding its accurate statement of this test, the majority misapplies it.
I. Step One: Do the Facts Allege an Eighth Amendment Violation?
A. The Eighth Amendment Standard
The Eighth Amendment prohibits punishments inconsistent with “evolving standards of decency that mark the progress of a maturing society.” Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Conditions of prison confinement violate the Eighth Amendment only if they “deprive inmates of the minimal civilized measure of life’s necessities.” Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Thus, for example, a prison in which inmates are recruited to serve as armed guards, four to eleven inmates are crowded into windowless 8É x 10É cells during periods of punitive isolation, those inmates sleep on floor mattresses infested with hepatitis and other infectious diseases, and the inmates receive only 1,000 calories of “grue” to eat each day, violates the Eighth Amendment. Hutto v. Finney, 437 U.S. 678, 682-83, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). On the other hand, a prison in which inmates have less living space than experts deem appropriate for their physical and mental health, and the prison houses more inmates than it was designed to hold, does not violate the Eighth Amendment. Rhodes, 452 U.S. at 348-49, 101 S.Ct. 2392. As the Supreme Court has said, “the Constitution does not mandate comfortable prisons.” Id. at 349, 101 S.Ct. 2392.
In deciding whether a particular condition violates the Eighth Amendment, we must not look first to our subjective judgments. See Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion) (“Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent.”). The best indication that a condition is “cruel and unusual” is' a consensus among the state legislatures. See Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 2247, 153 L.Ed.2d 335 (2002) (“[T]he ‘clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country’s legislatures.’ ”) (citation omitted). Only where there is a consensus may we consider whether our own judgment tips the balance towards finding a constitutional violation. Id. (“Thus, in cases involving a consensus, our own judgment is ‘brought to bear.’ ”) (citation omitted).
Subpar medical care does not automatically violate the Eighth Amendment. “Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.” Estelle, 429 U.S. at 106, 97 S.Ct. 285. To be “cruel and unusual,” medical care, like other prison conditions, must contravene “evolving standards of decency.” Id. Thus, only “acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs” can violate the Eighth Amendment. Id. This test contains objective and subjective components.
Objectively, the prisoner must present “serious medical needs.” A serious medical need is “one that has been diagnosed *273 by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor’s attention.” Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.1987) (citation omitted). A medical need is also serious where the denial of treatment would result in the “unnecessary and wanton infliction of pain,” Estelle, 429 U.S. at 103, 97 S.Ct. 285, or a “life-long handicap or permanent loss,” Lanzaro, 834 F.2d at 347.
Subjectively, prison officials must exhibit “deliberate indifference” to those needs. Under that standard,
a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.
Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
B. Environmental Tobacco Smoke (“ETS”) Claims
Occasionally prisoners bring Eighth Amendment suits alleging that their exposure in prison to second-hand smoke, known as environmental tobacco smoke (“ETS”), constitutes “cruel and unusual punishment.” These ETS claims, as they are called, come in two varieties — present injury claims and future injury claims— and are measured by different standards. Atkinson’s suit involves both.
1. Requirements for Present Injury Claims
A present injury claim alleges that exposure to ETS poses a risk to a prisoner’s existing medical needs. It is a standard condition-of-confinement claim governed by the principles the Supreme Court established in Estelle and Farmer. Thus, a prisoner must allege a sufficiently serious medical need (the objective component) and deliberate indifference by prison officials in response (the subjective component).
2. Requirements for Future Injury Claims
A future injury claim alleges that an inmate’s ETS exposure is creating a risk of future medical harm so grave that society will not condone its prisoners (or anyone else) being exposed to it. Helling v. McKinney, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1994). Helling analyzed only future injury ETS claims.[1] An inmate whose cellmate smoked five packs of cigarettes a day sued under the Eighth Amendment for injunctive relief and compensatory damages, alleging that his constant exposure to ETS damaged his health. Id. at 28, 113 S.Ct. 2475. The Magistrate entered a directed verdict for the prison officials. He reasoned that although the plaintiff could hypothetically prevail on his claims by showing serious medical needs and deliberate indifference to those needs, he could not support either prong with sufficient evidence. The Court of Appeals reversed in part, finding that the Magistrate properly rejected the present injury claim but should have allowed the plain *274 tiffs suit to proceed on the theory that the level of ETS to which he was exposed posed an intolerable risk to his future health, i.e. a future injury claim. Id. at 28-29, 113 S.Ct. 2475.
The Supreme Court affirmed, it held that, in theory, a prisoner forced to inhale five packs a day of second-hand smoke conceivably might face future health risks sufficiently serious to violate the Eighth Amendment. It observed, for example, that in Hutto v. Finney, 437 U.S. at 682, 98 S.Ct. 2565, the high risk that prisoners would eventually contract hepatitis and venereal disease from their communal floor mats helped to support a finding of an Eighth Amendment violation. Helling, 509 U.S. at 33, 113 S.Ct. 2475. Similarly, unreasonably high ETS levels could create a condition of confinement that “is sure or very likely to cause serious illhess and needless suffering the next week or month or year.” Id. In light of this possibility, the Court remanded for the District Court to evaluate the plaintiffs future injury claim on the merits. Id. at 35, 113 S.Ct. 2475 (“We cannot rule at this juncture that it will be impossible for McKinney, on remand, to prove an Eighth Amendment violation based on exposure to ETS.”).
Helling established a strict test for Eighth Amendment ETS claims. The Court stated that on remand the plaintiff was required to “prove both the subjective and objective elements necessary to prove an Eighth Amendment violation.” Id. at 35, 113 S.Ct. 2475. As the Court’s opinion reveals, a prisoner bears significant burdens in establishing a viable claim, and a district court must undertake a number of inquiries to determine whether a plaintiff has produced sufficient evidence to support a future injury claim.
As to the first — the objective factor — a plaintiff “must show that he himself is being exposed to unreasonably high levels of ETS.” Id. For example, in the circumstances of the case before the Helling Court, “[p]lainly relevant to this determination is the fact that [the prisoner] has been moved [from one prison to another] and is no longer the cellmate of a five-pack-a-day smoker.” Id. Also, the fact that the director of the Nevada state prison system subsequently had adopted a formal smoking policy meant that
[i]t is possible that the new policy will be administered in a way that will minimize the risk to [the prisoner] and make it impossible for him to prove that he will be exposed to unreasonable risk with respect to his future health or that he is now entitled to an injunction.
Id. at 36, 113 S.Ct. 2475. In addition, “determining whether [the prisoner’s] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS.” Id. Courts must “assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.” Id. Stated another way, “the prisoner must show that the risk of which he complains is not one that today’s society chooses to tolerate.” Id.
As to the second factor — the subjective factor known as deliberate indifference— the district court should make its conclusions “in light of the prison authorities’ current attitudes and conduct, which may have changed considerably since the judgment of the Court of Appeals.” Id. In Helling, the Supreme Court noted that because Nevada had adopted a smoking policy, for its prisons, this “will bear heavily on the inquiry into deliberate indifference,” possibly making it more difficult to *275 show that prison officials are not responding to the dangers of ETS, and reducing inmates’ exposure as a result. Finally, “[t]he inquiry into this factor also would be an appropriate vehicle to consider arguments regarding the realities of prison administration.” Id.
C. Application of the Law to Atkinson’s Case
This case in my view is underwhelming with regard to either the present or future injury claims.[2] Atkinson’s allegations of “constant” exposure to ETS for approximately seven months theoretically may present a viable claim, but the evidence identified by the District Court is insufficient to establish an Eighth Amendment violation. Atkinson cannot show that his current condition creates a “serious medical need,” or that, following a scientific and statistical inquiry, his risk of future harm is “so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.” Id. at 34, 36, 113 S.Ct. 2475.
The majority decides what conditions society will not tolerate in its prisons without considering what society itself — primarily through the decisions of its local legislators and politicians — has said on the topic. The majority’s attempt to assemble a societal consensus consists of its citing an executive order by the then-Governor of Delaware restricting smoking in some state buildings, but exempting prisons. Del. Exec. Order 71, at P. 6 (Apr. 4, 1989). Even without the prison exemption, a single executive order from one state is obviously inadequate evidence of a national consensus.[3] Moreover, in light of the pris *276 on exemption, the majority’s extrapolation of any (let alone a national) consensus is a generous view of Delaware’s status as a bellwether of public opinion.[4]
1. Present Injury Claim
Atkinson has failed to present evidence from which a jury reasonably could find a serious medical need. His physical condition belies any harm. For example, Atkinson does not suffer asthma attacks in response to ETS.[5] He does not seem to require medical treatment. Indeed, no doctor has ordered that Atkinson be placed in a non-smoking area.
Further undermining Atkinson’s present injury claim is the dearth of medical evidence in his favor. The report from Atkinson’s doctor, Dr. Rizzo, is so lacking that it might as well have been written for the defendants. It says that Atkinson’s 1995 pituitary surgery, not second-hand smoke, causes his chronic headaches. It also observes that Atkinson smoked for twenty-seven years, and that his symptoms did not change during the year he was isolated from second-hand smoke in prison. It concludes that Atkinson has “symptoms of persistent reactive nasal passages and airways based on his response to exposure to seasonal changes in temperature and air quality” and that Atkinson’s “spirome-try [lung function] is currently normal.” (Emphasis added.)
The only statement in the report conceivably supporting Atkinson’s claim is Dr. Rizzo’s ambivalent “impression” that “it is within reasonable medical probability that symptoms of itchy and burning eyes, chest pains, sore throat, persistent cough with sputum production, paroxysms of coughing and resultant headaches would all [be] precipitated by exposure to second-hand smoke.” An impression is not a diagnosis. Even if it were, it is unavailing for Atkinson. Not only does the report not suggest that Atkinson’s symptoms constitute “serious medical needs,” it does not even say that ETS caused them, only that it is “within reasonable medical probability” that these symptoms would be caused by exposure to ETS. Instead of “it is reasonably medically certain” — or even “it is reasonably medically . probable,” Dr. Rizzo writes as if it is possible that Atkinson’s symptoms fall within the larger set of medical probability.
The affidavit from the prison medical director, Dr. Keith Ivens, weakens Atkinson’s claim even further. Dr. Ivens writes that Atkinson never complained to him of secondhand smoke during several examinations, that Atkinson’s symptoms are consistent with “seasonal allergies,” and that they are, in fact, likely caused by allergies because the unit where he “has resided for more than the past year (1-F) is a smoke-free environment.” Dr. Ivens concludes: “I can see no medical evidence that sec *277 ond-hand smoke is adversely affecting the health of Roger Atkinson.”
Fully accepting the District Court’s findings, Atkinson’s symptoms cannot be the predicate for a present injury Eighth Amendment violation. They are not severe enough to constitute a serious medical need. Every prisoner faces discomforts in prison that he would rather avoid, but that nonetheless do not violate the Constitution. See Rhodes, 452 U.S. at 349, 101 S.Ct. 2392.
2. Future Injury Claim
Atkinson’s future injury claim fares no better. As already mentioned, Helling held that a successful ETS claim under the Eighth Amendment must meet two objective criteria. It requires “more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS.” 509 U.S. at 36, 113 S.Ct. 2475. “[I]t also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today’s society chooses to tolerate.” Id.
The District Court’s “scientific and statistical inquiry” is a generic letter from A. Judson Wells, Ph.D., about the dangers of ETS. That letter summarizes several recent studies demonstrating a link between second-hand smoke and increased risk of heart disease and lung cancer. Those studies have nothing to do with prison settings or with Atkinson’s particular case. The letter concludes: “Overall, I would say that for Mr. Atkinson to continue in a smoke filled cell would increase his risk of death, or non-fatal heart attack or stroke. Lung cancer risk develops more slowly.”
This letter does not satisfy Helling. Dr. Wells did not study Atkinson himself to determine his particular increased risk of future disease; he merely generalized based on a selected set of studies from medical journals. The Seventh Circuit has specifically rejected the substitution of generalized medical knowledge for a specific medical examination. See Henderson v. Sheahan, 196 F.3d 839, 852 (7th Cir.1999) (“To avoid having damages awarded on the basis of mere speculation or conjecture, it only makes sense that the medical expert should be able to testify to a reasonable degree of medical certainty that the particular plaintiff himself faces the increased risk of harm whatever that level of risk.”). Here, when Dr. Wells attempted to extrapolate the results of outside studies to Atkinson, he did not even venture to suggest a level of increased risk for heart disease or stroke. And his prediction for lung cancer risk is even more ambiguous. That risk, he says cryptically, “develops more slowly.”
Moreover, Helling requires “more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS.” 509 U.S. at 36, 113 S.Ct. 2475 (emphasis added). The risk must “be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.” Id. Here, we do not know the risk, but even the studies Dr. Wells cites make it obvious that Atkinson is by no means likely to develop heart disease or lung cancer because he lived with a smoking cellmate (or cellmates) for several months. It thus appears a leap of logic to conclude that society finds this risk to exceed “contemporary standards of decency.” After all, millions of people not in prison volun *278 tarily tolerate similar levels of risk every day from second-hand smoke and numerous other sources. (Indeed, millions more smoke themselves.) In this context, Atkinson cannot state an Eighth Amendment claim based on his risk of future injury caused by ETS.[6]
As with the present injury claim, the majority’s analysis on this issue is unconvincing. The majority says nary a word about Atkinson’s failure to provide scientific or statistical evidence in support of his claim, as Helling expressly requires. And it offers no reason to believe that the risks to which Atkinson alleges he was exposed are so grave that it violates contemporary standards of decency to expose anyone to them unwillingly.
II. Step Two: Is the Right Clearly Established?
Because Atkinson does not state an Eighth Amendment violation on either his present injury or future injury claims, we do not have to consider whether his rights under the Eighth Amendment were clearly established. See Saucier, 533 U.S. at 201, 121 S.Ct. 2151 (“If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.”). Nonetheless, the majority’s analysis on this point merits a response.
A right is clearly established if “it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Id. at 202, 121 S.Ct. 2151. Qualified immunity “operates ‘to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.’ ” Hope v. Pelzer, — U.S. -, -, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (citation omitted). Accordingly, if our Court has not decided a particular question (which is the case here) and several other courts have reached inconsistent outcomes on relatively similar facts (which is also the case here[7]), the right at issue cannot be clearly established. See Donovan v. City of Milwaukee, 17 F.3d 944, 953 (7th Cir.1994) (“Because only two circuits had considered cases on point, reaching opposite results, we conclude that ‘the relevant case law was still developing [and] the key issue in this case had not been clearly settled.’ ”) (citation omitted); see also Wilson v. Layne, 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (“If judges thus disagree on a constitutional question, it is unfair to subject police to *279 money damages for picking the losing side of the controversy.”); Rogers v. Pendleton, 249 F.3d 279, 288 (4th Cir.2001) (“[I]f there are no cases of controlling authority in the jurisdiction in question, and if other appellate federal courts have split on the question of whether an asserted right exists, the right cannot be clearly established for qualified immunity purposes”).
To demonstrate that Atkinson’s right to be shielded from ETS was clearly established, the majority merely invokes Helling — without any accompanying analysis— and cites a number of other cases that do the same.[8] Saucier mandates that the inquiry into whether a right was clearly established for the purposes of granting qualified immunity “must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.” 533 U.S. at 201, 121 S.Ct. 2151. The majority simply passes on the mandatory examination into whether this plaintiff under the circumstances of this case had a clearly established Eighth Amendment right to not be exposed to this level of ETS. See Mills, 229 F.3d at 1143, 2000 WL 1250781, at *5 (“Helling does not guarantee plaintiff a smoke free environment.”).
On the present injury claim, considering the lack of medical evidence in Atkinson’s favor, no reasonable prison official could have predicted that Atkinson’s relatively minor symptoms (which appear to have been caused by seasonal allergies) would support an Eighth Amendment suit. The majority cites no case to the contrary, and certainly not the “consensus of cases,” Rogers, 249 F.3d at 287-88, needed to overcome qualified immunity.
On the future injury claim, neither the Supreme Court nor any other court has stated that a particular level of ETS violates the Eighth Amendment. Helling did not conclude that the level of ETS exposure in that case — five packs a day in a two-person cell — was cruel and unusual; the Supreme Court remanded for the trial court to make this determination following a fact-intensive inquiry. Our jurisdiction is limited to reviewing whether the set of facts identified by the District Court is sufficient to establish a violation of a clearly established constitutional violation. The facts identified by the District Court’s analysis in this case do not.
For these reasons, I respectfully dissent.

. The complaint in Helling alleged present and future injuries, but the Supreme Court focused on the future injury claim. See 509 U.S. at 31, 113 S.Ct. 2475 (stating “the primary question on which certiorari was granted” to be “whether the court below erred in holding that McKinney had stated an Eighth Amendment claim on which relief could be granted by alleging that his compelled exposure to ETS poses an unreasonable risk to his health.”) (emphasis added).

. The majority repeatedly scolds my dissent for entering the "forbidden territory” of evidence-weighing. This assertion is contradicted by the very language the majority cites for support. In Ziccardi v. City of Philadelphia, 288 F.3d 57, 61 (3d Cir.2002), we stated that
we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove; but we possess jurisdiction to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right.
In other words, Ziccardi instructs that in cases where the district court denied summary judgment by finding genuine issues of material fact, the appeals court does not have jurisdiction to review questions of fact (e.g., did the plaintiff request, and the defendant refuse, a transfer to a nonsmoking cell), but it does have jurisdiction to review questions of law (e.g., on the basis of the facts identified by the district court, did the plaintiff adequately allege the violation of a clearly established constitutional right).
Here, the District Court concluded that "genuine issues of material fact exist as to: (1) whether Plaintiff was exposed to unreasonably high levels of ETS; and (2) whether it is contrary to current standards of decency for anyone to be exposed to sufficient environmental tobacco smoke to cause the symptoms Plaintiff suffered.” The District Court’s findings that the levels of ETS to which Atkinson was exposed may have been both unreasonable and contrary to current standards of decency thus fall within our appellate jurisdiction "to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right."

. In May 2002 the Delaware General Assembly passed significantly tightened restrictions on smoking in public spaces. 16 Del. C. § 2903, amended by 2002 Delaware Laws Ch. 275 (S.B.99) (effective late November 2002). It is certainly possible that other states will do the same. According to the Centers for Disease Control, however, as of October 16, 2002, only California has eliminated smoking from virtually all its public places, including bars and restaurants. See Exposure to Environmental Tobacco Smoke and Cotinine Levels — Fact Sheet, http:// www.cdc.gov/to bacco/research_data/environ-mental/factsheet_ets.htm (last visited January 2, 2003). Nevertheless, Delaware's statute covers only "any indoor enclosed area to which the general public is invited or in which the general public is permitted,” and *276 therefore clearly not prisons. Moreover, the public smoking laws of a few states do not amount to a national consensus. With regard to the second prong of the Saucier test, even if these laws did represent a new national consensus, they do nothing to make that consensus "clearly established” in 1998 and 1999 when the events in this case took place.

. The majority's statement in footnote 7 that "[p]roof of a national consensus might include, inter alia, the federal regulation which protects the public and federal employees from ETS in all federal workplaces” lays out just how speculative the majority's rationale is. That the District Court might have found evidence of a societal consensus on ETS within the Code of Federal Regulations is not to say that it did.

. Atkinson does hint that he is asthmatic or that he had "childhood asthma," but neither he nor his doctors contend that the evidence could support a claim that he suffers from asthma now.

. Because Atkinson cannot satisfy the objective requirements of showing a serious medical need or an unreasonably grave risk of injury on either his present injury or future injury claims, we do not need to consider whether prison officials demonstrated deliberate indifference.

. The majority cites a number of opinions in support of its assertion that prisoners have a clearly established right to be free from unreasonable levels of ETS. In most of these decisions the court made little effort to determine whether the circumstances represented an unacceptable risk to prisoners' health, presumably because most of the cases involved appeals from rulings on motions to dismiss, a much easier stage to survive than summary judgment because, unlike summary judgment, motions to dismiss require no evidentiary support for the plaintiffs' claims. Ultimately, ETS claims for either present or future injuries rarely succeed unless the exposure is obviously intolerable. See, e.g., Richardson v. Spurlock, 260 F.3d 495 (5th Cir.2001); Henderson v. Sheahan, 196 F.3d 839 (7th Cir.1999); Scott v. District of Columbia, 139 F.3d 940 (D.C.Cir.1998); Oliver v. Deen, 77 F.3d 156 (7th Cir.1996); Mills v. Clark, 229 F.3d 1143, 2000 WL 1250781 (4th Cir.Sept.5, 2000) (unpublished). Granted, some of these decisions were appeals from decisions on the merits, not interlocutory appeals of qualified immunity determinations. Nevertheless, they demonstrate that many courts have rejected prisoner ETS claims and that plainly the circuits differ in their amenability to these suits.

. For example, the majority relies primarily on Warren v. Keane, 196 F.3d 330 (2d Cir.1999), in which the Second Circuit found that inmates could survive summary judgment on their future injury ETS claim by alleging that their confinement “creates serious long-term health risks.’’ Id. at 332. The cursory, four-page Warren opinion did not consider whether the facts plaintiffs alleged stated an Eighth Amendment violation, did not mention the level of smoke exposure or why that level might be unreasonably high under Helling, and referenced neither the required “scientific and statistical inquiry’’ nor any support for the proposition that society would find the ETS levels in that case — whatever they might have been — intolerable for its prisoners.
Contrary to the majority's assertion, I do not fail to recognize that Warren is factually and procedurally analogous. Warren lacks persuasive value not because it is distinguishable, but rather because it fails to perform the analysis mandated by a prisoner ETS claim.